[Cite as *State v. Thacker*, 2015-Ohio-4214.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | : | Hon. Sheila G. Farmer, J. |
| | : | Hon. Patricia A. Delaney, J. |
| -vs- | : | |
| | : | Case No. 14CA62 |
| | : | |
| DONOVAN IAN THACKER | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:          Appeal from the Richland County
                                 Court of Common Pleas, Case
                                 No.  2014 CR 0186 D



JUDGMENT:                        AFFIRMED




DATE OF JUDGMENT ENTRY:          October 7, 2015




APPEARANCES:

For Plaintiff-Appellee:                    For Defendant-Appellant:

BAMBI COUCH-PAGE                           JOHN C. O'DONNELL, III
RICHLAND CO. PROSECUTOR                    10 West Newlon Place
LILLIAN R. SHUN                            Mansfield, OH 44902
38 South Park St.
Mansfield, OH 44902

*Delaney, J.*

{¶1} Appellant Donovan Ian Thacker appeals from the judgment entry of conviction and sentence of the Richland County Court of Common Pleas. Appellee is the state of Ohio.

## FACTS AND PROCEDURAL HISTORY

*The Evidence at Trial*

{¶2} Appellant, 24, a convicted felon,[1] met Jennifer Bowman, 32, through her job at Volunteers of America when he was released from prison into the halfway-house program. Appellant and Bowman began to date in late October 2013 immediately upon appellant's release and appellant started "hanging around" Bowman's house frequently.[2] Bowman had four minor children: W.P., K.P., B.B., and A.B. At the time of these events, W.P. was 15 and his sister K.P. was 12. B.B. was 8 and A.P. was 3. Appellant babysat the children while Bowman worked.

{¶3} On February 6, 2014, around 6:00 p.m., appellant was at Bowman's house and as had become their habit, the couple drank beer and tequila. Also present was another adult named Jeff Losey and Losey's girlfriend. Losey eventually passed out in the living room, drunk, and his girlfriend left. Appellant offered W.P. a shot of tequila and Bowman did not object. W.P. spit

---

[1] Appellant has felony convictions for theft from an elderly person, misuse of credit cards, and felony domestic violence. Appellant also has misdemeanor O.V.I. convictions. He acknowledged his criminal activity arises from his alcoholism, which he was in treatment for at Volunteers of America when he met Bowman.

[2] Bowman's supervisor confronted her about dating someone from the program and told her if the relationship continued she would be fired. Bowman quit and did not work again during the pendency of this case.

out the tequila but remained in the room, sitting on the couch.  W.P.'s siblings played in another room.  W.P. observed appellant whisper something in his mother's ear; appellant then approached W.P. and said he wanted to speak to him upstairs.

{¶4}  W.P. assumed appellant wanted to reprimand him because W.P. "had an attitude" earlier that day about washing dishes.

{¶5}  W.P. testified he and appellant had a good relationship up to this point.  He first met appellant when his mother and stepfather were in the process of separating.  As his mother and appellant began to date, W.P. liked appellant; appellant helped the family with Christmas, bought things for the kids, and talked W.P.'s mom into letting him get his ears pierced.  On this day, W.P. headed upstairs with appellant behind him.

{¶6}  W.P. was surprised when appellant led him into his brother's bedroom and closed and locked the door.[3]  W.P. became alarmed when appellant approached him and became uncomfortably close to him.  W.P. testified appellant tried to kiss him and W.P. resisted, turning his head.  Appellant forced W.P. onto the bed, held him down, removed his pants, and forcibly sexually assaulted him.  W.P. described oral and anal penetration.

{¶7}  During the assault, W.P. cried  and yelled for his brother and sisters.  Music was playing loudly downstairs, however.  Finally K.P. and B.B. knocked on the bedroom door for about 20 seconds, causing appellant to stop

---

[3] B.B.'s room has a lock on the door but W.P.'s room does not.

the assault, pull his pants on, and tell W.P. to get dressed. Appellant left the room and went back downstairs.

{¶8} K.P. asked W.P. what was wrong and he did not reply; he ran into the bathroom where he threw up and took a long shower because he felt "dirty and nasty." W.P. cried in the shower and wondered whether he should tell his mom while appellant was still in the house. When he came out of the shower, he went into K.P.'s room and told her appellant raped him. K.P. was angry and demanded they tell their mother immediately, but W.P. urged her not to while appellant was still in the house. W.P. spent that night in K.P.'s bedroom because he was afraid.

{¶9} Early the next morning, Bowman briefly left the house. Upon her return, W.P. told her appellant raped him. W.P. testified his mother became angry and ran from the room. About 30 minutes later, she came back into the room and told W.P. she didn't believe him because appellant was "not that type of guy." She also told him not to tell anyone. W.P. was devastated and felt he made a mistake in telling his mother what happened.[4]

{¶10} Later that day, W.P. contacted his friend J.S. on Facebook and told her what happened. He told J.S. he didn't want to stay at his house. J.S. and her mother, Tiffany Reuer, drove to the house and picked W.P. up.

{¶11} Tiffany Reuer is an L.P.N. and a mandated child abuse reporter. J.S. told her what happened to W.P. When W.P. got into their car, he started

---

[4] At trial, Bowman testified she never told W.P. she didn't believe him, although he "may have gotten that feeling" from her failure to take action and her feeling that she "didn't want it to be true." Bowman admitted at trial she initially lied to investigators to protect appellant.

crying. Reuer talked to him and explained he needed to disclose what happened and to go to the hospital. At first W.P. resisted but then was willing to go because he was in pain; Reuer testified W.P. was visibly uncomfortable sitting. W.P. testified he was bleeding and was afraid something was seriously wrong.

{¶12} Reuer first took W.P. to his father's house to tell him what happened and to give his father the opportunity to seek help. The father had no vehicle, however, and asked Reuer to take W.P. to the hospital. Reuer took W.P. to MedCentral in Mansfield.

{¶13} A Sexual Abuse Nurse Examiner (SANE) nurse examined W.P. on February 8 and documented physical evidence of the rape. W.P. had physical injuries including bruising to his arm and abrasions, redness, and swelling to his rectum consistent with sexual assault. The history of the assault reported by W.P. was consistent with the injuries observed. The SANE nurse testified the injuries could not have been caused by diarrhea or bowel movements. The abrasions and tears were consistent with penetration. The nurse did not find blood during the exam but there was blood in W.P.'s underwear. In the time since the rape, W.P. had used the bathroom, showered, vomited, brushed his teeth, and changed clothes repeatedly. The nurse testified showering could wash away even internal D.N.A. evidence within that time period.

{¶14} From the hospital, W.P. went to the Mansfield Police Department and provided a statement to investigators. Police went to the residence and collected a camouflage blanket from B.B.'s bed. No other physical evidence was collected from the residence although the bedroom was photographed. The rape

kit and blanket tested negative for the presence of semen so no D.N.A. testing was performed.

{¶15} Children's Services launched an investigation as well. Appellant was forbidden from having any contact at all with the children. W.P. was placed in the temporary custody of his father. Bowman's mother lived at the residence on a temporary basis to ensure Bowman was appropriate with the other children.

{¶16} In the meantime, Bowman told appellant everything investigators revealed about W.P.'s injuries and statements. Appellant was still on probation and reported to his probation officer, who placed him in custody for a probation violation related to the alcohol consumption. While appellant was in custody, detectives interviewed him and he denied raping W.P. Appellant said his experience in prison was child sex offenders are not treated well. He also denied drinking at Bowman's house.

{¶17} Bowman continued to communicate with appellant while he was in jail. They wrote, visited, or talked by phone every day. Bowman also had contact with appellant's mother and they discussed explanations for W.P.'s injuries, including a virus the family experienced in the weeks leading up to the rape which had caused diarrhea. Appellant and Bowman discussed an escape plan in which appellant would fake an illness in order to be transported to the hospital from which Bowman would help him escape. One of the letters they exchanged contained a hand-drawn map of the hospital. Bowman continually expressed her love and support for appellant.

{¶18} In the weeks before the trial, the prosecutor's office presented Bowman with evidence appellant had been corresponding with another woman from jail as well. Bowman ultimately stopped supporting appellant and her contact with him ceased. At trial, Bowman acknowledged she first supported appellant over her son, but said over time she thought about appellant's lies and manipulation and how long he had been upstairs with W.P. that night. Bowman denied her changing attitude had anything to do with the pending dependency and abuse case against her in family court through which she was required to comply with a case plan.

{¶19} W.P.'s father testified that since the rape, W.P. has been in counseling and takes medication for anxiety and depression. In the weeks and months after the rape, W.P. wakes up from nightmares screaming.

{¶20} Appellant testified on his own behalf at trial. He acknowledged his felony record and his alcoholism. He denied insinuating himself into Bowman's family over a very short period of time and denied singling out W.P. and grooming him for sexual abuse. He also denied raping W.P., stating he went upstairs with W.P. that night and they talked about various issues W.P. was having. Appellant said he was drunk and "lectured" W.P. which may have made him appear upset when K.P. observed them in B.B.'s bedroom. Appellant claimed that he couldn't remember what he said when Bowman first asked him whether he raped W.P. other than to say "absolutely not."

{¶21} Bowman was recalled by appellee upon rebuttal and testified that when she first confronted appellant with the rape accusation, he said W.P. "came

on to him" but nothing happened. She also testified to the timeline of the diarrhea virus. W.P. also testified upon rebuttal and said he did have diarrhea in February but it did not cause bleeding; he did not have a habit of spending the night in K.P.'s room; and he had no problems with appellant in general prior to the rape.

*Indictment, Conviction, and Sentence*

{¶22} Appellant was charged by indictment with one count of forcible rape pursuant to R.C. 2907.02(A)(2) [Count I]; one count of kidnapping pursuant to R.C. 2905.01(A)(4) [Count II]; and one count of unlawful sexual conduct with a minor pursuant to R.C. 2907.04(A)(1) [Count III]. Appellant entered pleas of not guilty and the case proceeded to trial by jury. Appellant was found guilty as charged. Counts II and III merged with Count I and the trial court sentenced appellant to a prison term of 11 years.[5]

{¶23} Appellant raises four assignments of error:

**ASSIGNMENTS OF ERROR**

{¶24} "I. THE TRIAL COURT ERRED TO DEFENDANT/APPELLANT'S PREJUDICE BY REFUSING TO ADMIT TESTIMONY OF VICTIM'S SEXUAL PREFERENCE OR ORIENTATION."

{¶25} "II. THE TRIAL COURT COMMITTED PLAIN ERROR IN ALLOWING EXTRANEOUS EVIDENCE IN REBUTTAL TESTIMONY BY TWO STATE'S WITNESSES."

---

[5] Appellant was also found guilty of a probation violation and sentenced to a consecutive 18-month term on that offense.

{¶26} "III.  THE DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION."

{¶27} "IV.  THE COURT ERRED IN SENTENCING DEFENDANT TO THE MAXIMUM SENTENCE."

**ANALYSIS**

I.

{¶28} In his first assignment of error, appellant argues the trial court should have allowed evidence of the victim's "sexual preference or orientation" and also summarily argues that purported evidence of the victim's sexual activity would have been admissible.  We disagree.

{¶29} The admission or exclusion of relevant evidence is a matter left to the sound discretion of the trial court.  Absent an abuse of discretion resulting in material prejudice to the defendant, a reviewing court should be reluctant to interfere with a trial court's decision in this regard.  *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967).

{¶30} Appellant's argument here is premised upon a mischaracterization of the record.  Appellant argues "Defendant/Appellant's Counsel wanted to admit testimony that the victim had told Defendant/Appellant that he liked to have homosexual sex."  (Brief, 4).  No such statement or conversation was in evidence.  In fact, the record reveals the proffered evidence in the pretrial conference consisted of the following:

THE COURT: We have a motion in limine. The prosecutor has asked that the defendant be prohibited from bringing in other evidence of the victim's sexual activity.

[Defense counsel]; you think you have appropriate evidence to bring in. What evidence do you intend to offer of the victim's sexual--

[DEFENSE COUNSEL]: There is no direct evidence of sexual activity before or after the incident. There is a lot of evidence regarding the sexual orientation of the boy in the months leading up to the offense, there was a conflict with that, it was a topic of discussion with his mother, with [appellant] himself and others as well.

There is evidence he is troubled. He cuts himself, there are issues going on in his life, including his sexual orientation. The testimony is he was bullied at school.

THE COURT: How is that relevant to this case?

[DEFENSE COUNSEL]: Because it shows an animus for--part of our defense is the relationship between his mother and [appellant] was a source of agitation for him, a source of animosity.

THE COURT: How is that a defense for your client?

[DEFENSE COUNSEL]: It gives him reason for motivation, gives him a reason to come up with a story to get him out of the house.

THE COURT: He's lying about your client to get away from his mother?

[DEFENSE COUNSEL]: To get my client out of their lives.

* * * *.

T. 6-7.

{¶31} And later, when the trial court suggests any evidence pertaining to the victim's sexual orientation is wholly irrelevant because the victim is 15 and even alleged consent to a sexual act is not a defense:

* * * *.

[DEFENSE COUNSEL]: I understand what your ruling is going to be, but the purpose of the evidence of his sexual orientation isn't to establish conduct on his part or smear his reputation. It's to show it was an issue of animosity between himself, his mother, and [appellant] the day they were talking to him, he was running into problems at school, with counseling. And according to information I received, that was a source of unhappiness for [W.P.]. It shows a reason he would be upset with my client, on top of many other reasons.

* * * *.

T. 11.

{¶32} The trial court properly ruled the prejudicial effect of the proffered evidence, nebulous at best outweighed any probativeness and was therefore inadmissible.

{¶33} Appellant further argues, though, that evidence of the victim's sexual activity should have been admitted, another argument that was not before the trial court. Defense trial counsel specifically acknowledged "[t]here is no direct evidence of [the victim's] sexual activity before or after the incident." T. 6, supra. Instead, appellant's argument at trial was that the victim was having emotional problems that somehow culminated in him wanting appellant out of their lives, an argument the trial court correctly determined is unrelated to evidence of sexual orientation.

{¶34} On appeal, though, appellant argues "[t]he evidence of sexual orientation was relevant to the issue of why there was evidence of penetration to the rectum of [the victim]." Brief, 4. Such evidence was neither proffered nor argued at trial. Based solely upon appellant's contention here, the admission of such evidence would clearly violate Ohio's rape shield law, which excludes reputation, opinion, and specific-acts evidence of a victim's alleged sexual history unless an exception applies. *State v. Shuster*, 5th Dist. Morgan Nos. 13AP0001and 13AP0002, 2014-Ohio-3486, ¶¶ 68-69, appeal not allowed, 141 Ohio St.3d 1489, 2015-Ohio-842, 26 N.E.3d 824, reconsideration denied, 142 Ohio St.3d 1469, 2015-Ohio-1896, 30 N.E.3d 976, citing R.C. 2907.02(D); R.C. 2907.05(E). Appellant's summary argument fails to address any exception under which such evidence would be relevant or admissible.

{¶35} We further note the sexual-orientation issue was raised before the trial court as a motion in limine by appellee: appellee moved to exclude evidence of the victim's sexual orientation and appellant responded in opposition. Appellant never raised the issue again after the trial court granted the motion in limine. In *State v. Pyo,* 5th Dist. Delaware No. 04CAA01009, 2004-Ohio-4768, we explained: "In general, the ruling on a motion *in limine* does not preserve the record on appeal and an appellate court need not review the ruling unless the claimed error is preserved by an objection at trial." *State v. Grubb*, 28 Ohio St.3d 199, 503 N.E.2d 142 (1986), paragraph two of the syllabus, citing, e.g., *State v. Leslie*, 14 Ohio App.3d 343, 344, 471 N.E.2d 503 (1984).

{¶36} Appellant's first assignment of error is overruled.

II., III.

{¶37} Appellant's second and third assignments of error are related and will be considered together. Appellant argues the trial court should not have permitted the victim and his mother to testify on rebuttal and that defense trial counsel was ineffective for failing to object to the rebuttal witnesses. We disagree.

{¶38} "Rebutting evidence is that given to explain, refute, or disprove new facts introduced into evidence by the adverse party; it becomes relevant only to challenge the evidence offered by the opponent, and its scope is limited by such evidence." *State v. McNeill,* 83 Ohio St.3d 438, 446, 700 N.E.2d 596 (1998); *State v. Grinnell,* 112 Ohio App.3d 124, 146, 678 N.E.2d 231 (1996) ["The purpose of rebuttal is to permit the state the opportunity to refute new evidence

offered by the defendant in the presentation of his case."]. The Ohio Supreme Court has held that "[a] party has an unconditional right to present rebuttal testimony on matters which are first addressed in an opponent's case-in-chief and [that is not testimony that should have been presented] in the rebutting party's case-in-chief." *Phung v. Waste Mgmt. Inc.,* 71 Ohio St.3d 408, 410, 644 N.E.2d 286 (1994). It has also written that "[i]t is within the trial court's discretion to determine what evidence is admissible as proper rebuttal." *McNeill,* supra, 83 Ohio St.3d at 446. In order to find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *State v. Richards*, 5th Dist. Stark No. 1999CA00362, 2000 WL 502831, *3 (Apr. 17, 2000), citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶39} Appellant argues appellee's rebuttal witnesses, Bowman and W.P., merely restated their testimony from direct examination. We disagree with this characterization. Both witnesses responded to the defense raised by appellant: that W.P.'s injuries may have been caused by a bout of severe diarrhea. Both witnesses also responded to specific claims raised in the defense case including W.P.'s alleged dislike of appellant and appellant's statement upon first learning of the accusation. Appellant's cited case, *State v. Leuin*, is inapposite because the error in that case was premised upon impermissible character evidence presented upon rebuttal. *State v. Leuin*, 11 Ohio St.3d 172, 175, 464 N.E.2d 552, (1984) (per curiam). Appellant cites no such impermissible character evidence here, nor is there any such evidence in the record.

{¶40} We find appellee's rebuttal testimony was limited to explaining, refuting, and disproving new facts introduced into evidence by appellant and was thus not improper.  As appellant further points out in his third assignment of error, defense trial counsel did not object to appellee's rebuttal testimony at trial.  In light of our analysis supra, however, this failure to object is not ineffective assistance of counsel.

{¶41} To succeed on a claim of ineffectiveness, a defendant must satisfy a two-prong test. Initially, a defendant must show that trial counsel acted incompetently. *See*, *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). In assessing such claims, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158 (1955). "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689. The question is whether counsel acted "outside the wide range of professionally competent assistance." *Id.* at 690.

{¶42} Even if a defendant shows that counsel was incompetent, the defendant must then satisfy the second prong of the *Strickland* test. Under this "actual prejudice" prong, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.

{¶43} In light of our determination that the rebuttal testimony was not improperly admitted, we find defense trial counsel did not act incompetently in failing to object thereto.  Moreover, upon our review of this trial record, there is no possibility that if the testimony was not admitted, the result of the trial would have been different.

{¶44} Appellant's second and third assignments of error are therefore overruled.

IV.

{¶45} In his fourth assignment of error, appellant argues the trial court erred in sentencing him to the maximum sentence.  We disagree.

{¶46} In *State v. Kalish,* 120 Ohio St.3d 23, 896 N.E.2d 124, 2008–Ohio–4912, the Ohio Supreme Court established a two-step procedure for reviewing a felony sentence. The first step is to "examine the sentencing court's compliance with all applicable rules and statutes in imposing the sentence to determine whether the sentence is clearly and convincingly contrary to law." *Kalish* at ¶ 4. If the first step is satisfied, the second step requires the trial court's decision be reviewed under an abuse-of-discretion standard. *Id.* We have recognized that "[w]here the record lacks sufficient data to justify the sentence, the court may well abuse its discretion by imposing that sentence without a suitable explanation." *State v. Firouzmandi,* 5th Dist. Licking No.2006–CA–41, 2006–Ohio–5823, ¶ 52.

{¶47} Subsequent to the Ohio Supreme Court's *Foster* decision, "[t]he decision to impose the maximum sentence is simply part of the trial court's overall discretion in issuing a felony sentence and is no longer tied to mandatory

fact-finding provisions." *State v. Parsons,* 7th Dist. Belmont No. 12 BE 11, 2013–Ohio–1281, ¶ 14.

{¶48} In the instant case, the trial court merged Counts II and III with Count I and sentenced appellant upon Count I.  The mandatory prison term of 11 years is within the statutory range for the offense of forcible rape and is in accordance with law.  R.C. 2907.02(A)(2); R.C. 2929.14(A)(1).

{¶49} In the instant case, on the record at the sentencing hearing, the trial court noted it considered the purposes and principles of sentencing contained in R.C. 2929.11 and considered the seriousness factors of R.C. 2929.12.

{¶50} The trial court also cited a number of specific factors relevant to the decision to impose a maximum sentence.  The injury was exacerbated by the victim's age; the victim suffered both physical and psychological harm; and the relationship between the offender and the victim facilitated the offense. This appellant also demonstrates the likelihood of recidivism because he was on community control when he committed the offense, the terms of which he violated by drinking and cohabitating with the victim's mother.  Appellant has a history of criminal convictions including an offense of violence and has not responded to treatment.  Finally, appellant demonstrated no remorse.

{¶51} We find the sentence of the trial court is fully supported by the record and does not constitute an abuse of discretion.

{¶52} Appellant's fourth assignment of error is overruled.

**CONCLUSION**

{¶53} Appellant's four assignments of error are overruled and the judgment of the Richland County Court of Common Pleas is affirmed.

By: Delaney, J. and

Gwin, P.J.

Farmer, J., concur.